UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONNY SHAVELSON, M.D., et al., <br><br>　　　　　Plaintiffs, <br><br>　　v. <br><br>ROBERT BONTA, et al., <br><br>　　　　　Defendants. | Case No.  21-cv-06654-VC <br><br>**ORDER GRANTING MOTIONS TO DISMISS** <br><br>Re: Dkt. Nos. 46, 48 |

California's End of Life Option Act gives some terminally ill Californians the ability to end their lives with aid-in-dying medication. The Act provides peace of mind to many people who would otherwise face a prolonged and painful death. But the Act does not help everyone. Sandra Morris is in the final stages of a neurodegenerative disease that will eventually claim her life. While she can currently take advantage of the relief provided by the Act, she knows she will lose this opportunity soon: She is imminently at risk of losing the ability to administer aid-in-dying medication on her own—a requirement under the Act. Morris, alongside the doctors who wish to assist her and other patients like her, have filed this lawsuit claiming that the self-administration requirement violates the Americans with Disabilities Act (ADA). But because allowing physicians to help people ingest aid-in-dying medication would fundamentally alter the Act, the plaintiffs have not stated a claim under the ADA. The complaint is therefore dismissed in its entirety.

**I**

**A**

In 2015, California enacted the End of Life Option Act, which permits qualifying

terminally ill people to receive prescriptions for medication that will bring about their death. Cal. Health & Safety Code § 443 *et seq.* The legislation was polarizing, eliciting passionate responses both in support and opposition from religious groups, medical practitioners, and activists— including those advocating for disability rights. In the face of this controversy, policymakers took pains to craft a statutory framework that would provide choice and peace to many, while acknowledging the weighty moral issues involved and protecting against abuse and coercion.

To that end, the Act carefully regulates the prescription and administration of aid-in-dying medication, limiting who can be prescribed such medication and how they can take it. To be eligible for a prescription, a person must have an "incurable and irreversible" disease that will "result in death within six months." § 443.1(r); § 443.2(a). Additionally, physicians may only prescribe the medication to qualifying people who have "the physical and mental ability to self-administer the aid-in-dying drug." § 443.2(a)(5).

The Act also sets out a series of hurdles that otherwise qualified people must clear. Before they can receive a prescription, a person must "submit two oral requests, a minimum of 48 hours apart," along with a written request. § 443.3(a). The written request must be signed and dated in the presence of two witnesses, each of whom must attest that the person "voluntarily" signed the request and is "of sound mind and not under duress, fraud, or undue influence." § 443.3(b)(2), (3). Before prescribing the medication, the attending physician must determine that their patient has the capacity to make medical decisions, has a terminal disease, and has requested the medicine voluntarily. § 443.5(a)(1)(A), (B), (C). The physician must also discuss the "potential risks" of taking the medicine with their patient, along with the "possibility" that the patient "may choose to obtain the aid-in-dying drug but not take it." § 443.5(a)(2)(B), (D).

But the Act's promise of choice would be an empty gesture had it not also granted criminal and civil immunity to prescribing physicians. In California, any person "who deliberately aids, advises, or encourages another to commit suicide is guilty of a felony." Cal. Penal Code § 401(a). Accordingly, the Act provides immunity for certain forms of assistance people may receive along the way. Physicians who prescribe medication in accordance with the

Act are immune from criminal, civil, and professional liability or discipline. Cal. Health & Safety Code § 443.14(c). Civil and criminal immunity also extend to those who "assist the qualified individual by *preparing* the aid in dying drug," so long as they do not assist them "in *ingesting*" the drug. § 443.14(a) (emphasis added); *see also* Cal. Penal Code § 401(b).

**B**

Sandra Morris is a California resident who has amyotrophic lateral sclerosis (ALS), a disease that destroys nerve cells in the brain and spinal cord, causing progressive loss of muscle control.[1] ALS is fatal, and there is no cure. Morris wants the option of taking aid-in-dying medication in the future, although she does not wish to do so now. However, due to the nature of her illness, she may lose this option soon. While Morris currently has the physical ability to self-administer the aid-in-dying medication without assistance, she will likely lack the hand strength and coordination to take the medication on her own in the near future. Morris seeks to represent a class of similarly situated individuals: Californians who qualify for the Act but may lose, or have already lost, the ability to self-administer medication because of the progressive nature of their illness.[2]

The other named plaintiffs in this action—Lonny Shavelson, Robert Uslander, Gary Pasternak, and Richard Mendius—are California physicians who wish to help their disabled patients ingest aid-in-dying medication. Each has witnessed the way that the Act's prohibition on assistance places many people in a gut-wrenching position, forced to choose between acting sooner, while they are physically able to administer the medication on their own, or waiting, and risk losing the ability to take the medication and enduring the prolonged sort of death they wished to avoid. They seek to represent a class of physicians who provide aid-in-dying care to patients with progressive, terminal illnesses.

---

[1] The facts described in this section come from the well-pleaded allegations in the complaint. As required at this early stage, all inferences are drawn in favor of the plaintiffs. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).
[2] The complaint was also brought on behalf of a second patient plaintiff: Rhiannon Cerreto. However, Cerreto died between the briefing of this motion and this order. *See* Dkt. No. 78. The Court therefore does not consider the allegations in the complaint concerning Cerreto.

The plaintiffs argue that the Hobson's choice presented to Morris and people like her is not just excruciating—it is unlawful. According to Morris, the Act's prohibition on assistance violates the ADA by denying her the ability to take aid-in-dying medication because of her physical disabilities. Further, the physicians argue that the Act unlawfully prevents them from helping disabled patients take aid-in-dying medication. The plaintiffs argue that the Act violates the Rehabilitation Act for the same reasons.

The plaintiffs have therefore sued those tasked with criminally prosecuting people under California Penal Code Section 401(a): Robert Bonta, the Attorney General of California, and Nancy O'Malley, the Alameda County District Attorney, along with the State of California. The plaintiffs seek a declaration that the assistance prohibition violates the ADA and the Rehabilitation Act, as well as an injunction prohibiting criminal prosecution of physicians who help their eligible disabled patients ingest aid-in-dying medication. The defendants have moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim.

## II

The defendants argue that this Court lacks jurisdiction to hear the case because the plaintiffs do not have standing under Article III. To satisfy Article III's case-or-controversy requirement, a plaintiff must allege that (1) they "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "the injury was likely caused by the defendant;" and (3) "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The defendants contend that the plaintiffs fail at prongs one and three.

### A

It should go without saying that Morris has successfully alleged a concrete injury. Morris suffers from ALS, a degenerative disease that is rapidly—and unpredictably—causing her to lose motor function. She therefore does not know at what point she will lose the ability to self-administer aid-in-dying medication. And once she loses this ability, that is that: Morris alleges that no physician will help her ingest the aid-in-dying medication because of the threat of

criminal prosecution, meaning that she must choose between taking the medication prematurely, or risk losing the option entirely.

The physician plaintiffs' injury is somewhat further removed, but also concrete. Rather than act now and defend themselves later, the physicians seek to preemptively establish that assisting their patients in the way they desire would not subject them to criminal liability. To satisfy Article III's standing requirements in the context of a pre-enforcement challenge, a plaintiff must show that they face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979). Where the feared prosecution is too "imaginary" or "speculative," there is no standing. *Id.* (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)). "In evaluating the genuineness of a claimed threat of prosecution," courts "look to whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1139 (9th Cir. 2000). The severity of the potential penalty (whether, for example, the feared enforcement would be civil or criminal) is also relevant. *See, e.g.*, *id.* at 1141.

The physicians have articulated a concrete plan to violate the law in question: If they receive relief in this Court, they will help qualified, disabled patients ingest aid-in-dying medication when the patients cannot do so themselves. Were the physicians to provide this assistance now, absent judicial relief, they would face a real risk of criminal prosecution— helping someone commit suicide is a felony in California, and neither the Attorney General nor the District Attorney has suggested that they will not enforce this criminal provision to its full potential. *See Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 393 (1988). Given the severity of the sanction the physicians would face if their interpretation of the ADA turns out to be incorrect, they cannot be expected to violate the law first and challenge it later.

**B**

5

The defendants next argue that the plaintiffs' injuries are unlikely to be redressed by judicial relief because this Court does not have the power to "amend" the End of Life Option Act. This argument misunderstands the nature of the plaintiffs' challenge and the Court's authority.

Under the Supremacy Clause, "state laws that conflict with federal law are 'without effect.'" *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) (quoting *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008)). The ADA therefore "requires preemption of inconsistent state law" when necessary to comply with its command—including the ADA's command that state and local governments provide "reasonable modification[s]" to their programs in certain circumstances. *Mary Jo C. v. New York State & Local Retirement System*, 707 F.3d 144, 163 (2d Cir. 2013); *see Smith v. City of Oakland*, 2020 WL 2517857, at *11 (N.D. Cal. Apr. 2, 2020). If it violates the ADA to criminally prosecute physicians who help qualified disabled people take aid-in-dying medication, then the plaintiffs may secure an injunction forbidding the defendants from doing so. *See Quinones v. City of Evanston*, 58 F.3d 275, 277 (7th Cir. 1995) ("A person aggrieved by the application of a legal rule does not sue the rule *maker*—Congress, the President, the United States, a state, a state's legislature, the judge who announced the principle of common law. He sues the person whose acts hurt him."); *Ex parte Young*, 209 U.S. 123, 159 (1908) (holding that a state attorney general could be enjoined from enforcing a state statute deemed inconsistent with federal law).

Finally, prosecutorial immunity is no barrier to the plaintiffs' claims. While prosecutors enjoy absolute immunity from damages liability, this protection does not extend to suits for injunctive relief. *See Gobel v. Maricopa County*, 867 F.2d 1201, 1203 n.6 (9th Cir. 1989) (citing *Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719, 736–37 (1980)), *abrogated on other grounds by Merritt v. County of Los Angeles*, 875 F.2d 765 (9th Cir. 1989).

### III

#### A

Title II of the ADA prohibits public entities from discriminating against people with disabilities: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Facial discrimination is a per se violation of the ADA. *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 735 (9th Cir. 1999). But a facially neutral policy can violate the ADA too, if it has the effect of denying people with disabilities "meaningful access" to the service or benefit. *Payan v. Los Angeles Community College District*, 11 F.4th 729, 738 (9th Cir. 2021). Therefore, to comply with Title II, a public entity must make reasonable accommodations to people with disabilities, unless the accommodation would "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). The question, then, is whether it would "fundamentally alter" the nature of the End of Life Option Act to permit physicians to administer aid-in-dying medication to otherwise eligible patients once they lose the ability to self-administer the medication due to their degenerative illness.

It would. The End of Life Option Act was the culmination of a multi-year process during which the California Legislature, Governor, and public debated the options that should be available to the terminally ill. The resulting framework draws a sharp boundary, allowing a person to take their own life with aid-in-dying medication, but forbidding the taking of anyone else's. As the Supreme Court has forewarned, this line may prove porous if not jealously guarded. *See Washington v. Glucksberg*, 521 U.S. 702, 733 & n.23 (1997) (arguing that permitting assisted suicide may start a state "down the path to voluntary and perhaps even involuntary euthanasia"); *id.* at 785 (Souter, J., concurring in the judgment). The accommodation that the plaintiffs seek—to permit physicians to administer aid-in-dying medication—would traverse this boundary, transforming the benefit available under the Act from the ability to end your own life to the ability to have someone else end it for you. Such an accommodation would "compromise[] the essential nature" of the Act, and would therefore fundamentally alter the program. *Alexander v. Choate*, 469 U.S. 287, 300 (1985).

The modification that the plaintiffs seek would fundamentally alter the Act for another, independent reason. One of the most difficult questions facing the drafters of the End of Life Option Act was how to provide people with the option of a peaceful death without opening the door to abuse or coercion. The legislature thus included numerous safeguards in the statute to ensure that, at every stage of the process, a person demonstrates their voluntary consent. For example, a request for a prescription for aid-in-dying medication may only be made by the person themselves—not anyone acting on their behalf. Cal. Health & Safety Code § 443.2(c). The person must make two oral requests, a minimum of 48 hours apart, and a written request, all directly to their physician. § 443.3(a). They must sign the request in the presence of two witnesses, neither of whom can be the requester's physician, and at least one of whom must not be related to the requester. § 443.3(b)–(d). The person can revoke their request at any time, and the attending physician must reiterate this before prescribing the medication. § 443.4(a); § 443.5(a)(6). And they may ultimately decline to take the medication, even after receiving it. § 443.4(a).

The final protection is the requirement at issue here: that the person administer the aid-in-dying medication themselves. As the legislature recognized, this final protection is the only way to ensure beyond any doubt that ingestion is a voluntary act. A person seeking to end their life pursuant to the Act can opt out at any point—after requesting or receiving the prescription, after the drugs are in their hand, after the feeding tube has been installed, after saying goodbye. The accommodation that the plaintiffs seek would significantly undermine these protections by opening a window during which there would be no way of knowing whether the patient had changed their mind.

## B

The plaintiffs argue that it is inappropriate to consider whether the requested accommodation would fundamentally alter the Act without discovery. It is true that in most cases, whether a proposed modification would fundamentally alter the program is a fact-based inquiry that cannot be adjudicated on a motion to dismiss. But where the accommodation that the

plaintiff seeks would transform the essential nature of the program on its face, resolution is appropriate at the pleading stage.

To see why, consider *Crowder v. Kitagawa*—the go-to case in this Circuit for the principle that "the determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry." 81 F.3d 1480, 1486 (9th Cir. 1996). *Crowder* concerned a challenge to Hawaii's regulation requiring all carnivorous animals (including dogs) to quarantine for 120 days upon entering the state, with the goal of preventing the importation of rabies. *Id.* at 1481–82. A group of visually impaired people sued, arguing that the regulation discriminated against people who use guide dogs. The Ninth Circuit reversed the district court's grant of summary judgment to Hawaii. The district court had erred, the Ninth Circuit held, by deferring to the legislature's policy judgment that this restriction was necessary to accomplish the goals of the regulation, rather than conducting its own fact-finding on the reasonableness of the policy. *Id.* at 1485–86. If courts decline to reevaluate legislative decision-making in this context, "any state could adopt requirements imposing unreasonable obstacles to the disabled, and when haled into court could evade the antidiscrimination mandate of the ADA merely by explaining that the state authority considered possible modifications and rejected them." *Id.* at 1485. Courts have a responsibility to ensure "that the mandate of federal law is achieved"—a mandate that will sometimes require "reasonable modifications to public health and safety polices" set by state actors. *Id.*

This case, however, is unlike *Crowder* in an important respect. *Crowder*'s fundamental-alteration analysis involved weighing various public health factors, including "the nature of the rabies disease, the extent of the risk posed by the disease, and the probability that the infected animals would spread it." *Id.* at 1486. The Ninth Circuit instructed the district court to consider whether, in light of the difficulty of implementing proposed alternatives and their relative effectiveness, Hawaii's chosen policy was reasonable. *Id.* But here, the central problem with the plaintiffs' proposed modification is not that it would be too difficult to implement or that it would make the End of Life Option Act less effective. The problem is that it would transform the

9

benefit under the Act into something else entirely. It is therefore appropriate, in this unusual circumstance, to decide this question at the pleading stage. *See, e.g.*, *Bedford v. Michigan*, 722 F. App'x 515, 520 (6th Cir. 2018); *Castellano v. City of New York*, 946 F. Supp. 249, 254 (S.D.N.Y. 1996) ("Although questions of the reasonableness of an accommodation or the essentialness of an eligibility requirement generally need a fact-specific inquiry, . . . certain eligibility requirements of a program by their nature are essential and any alteration unreasonable as a matter of law.").

## C

In response to the motion to dismiss, the plaintiffs stated (for the first time in this litigation) that they are now seeking a far narrower accommodation. Rather than argue that the self-administration requirement violates the ADA full-stop, the plaintiffs now request only that physicians be allowed to help if a patient begins ingesting aid-in-dying medication on their own but is unable to complete the process. At the hearing, the counsel for the plaintiffs explained their request this way: "The modification that we're requesting is that anyone with a physical disability who is unable to complete the process of ingesting aid medication be allowed assistance by their physician as long as the patient is able to commence ingestion with a physical, voluntary, and conscious act."

This new theory is susceptible to two interpretations. On one (broader) reading, the plaintiffs' proposed accommodation would permit physicians to assist their patients so long as the patient is able to communicate to the physician by a physical, voluntary, and conscious act (such as a blink) their desire to take the medication. If this is what the plaintiffs are proposing, they fail to state a claim for the reasons described above: Permitting a physician to assist a patient based solely on that patient's communication would fundamentally alter the End of Life Option Act by legalizing the killing of others—something the Act declines to do.

A narrower reading of the plaintiffs' request is that physicians be able to step in if a patient commences ingestion on their own but is unable to complete the act; if, for example, a patient begins depressing a plunger that administers the medication but loses strength halfway

through.

It would not be appropriate to consider this theory of discrimination (and requested accommodation) on the current motion. The plaintiffs have filed a lawsuit asserting that anyone who is able to communicate their desire to ingest aid-in-dying medication but unable to administer it themselves (and who is otherwise qualified to benefit from the statute) suffers discrimination under the ADA. And the lawsuit seeks a remedy that would help everyone in that class. But now, in opposition to the motion to dismiss, the plaintiffs have articulated a theory of discrimination on behalf of a tiny sliver of the proposed class and an accommodation to benefit only that sliver. It is almost as if the plaintiffs have proposed a new lawsuit in response to the motion to dismiss.

What's more, even if the Court were to entertain the narrow reading of the plaintiffs' new theory of ADA liability, jurisdiction would almost certainly be lacking. To have standing, it appears the plaintiffs would need to plausibly allege that some patients find themselves in a situation where they start administering the medication on their own but are unable to complete the process; that their physician would fail to step in and help, due to the threat of criminal liability; and that a doctor who *did* step in would likely face criminal liability as a result. At this juncture, the assumptions required to support standing to pursue such a claim seem fanciful. Nonetheless, in an abundance of caution, dismissal of this lawsuit will be with leave to amend in the event the plaintiffs wish to press this unusual theory.

**D**

In addition to its anti-discrimination provision, the ADA makes it unlawful "to coerce, intimidate, threaten, or interfere with any individual" on account of their having assisted someone else in the enjoyment of "any right granted or protected" by the ADA. 42 U.S.C. § 12203(b). Because the patient plaintiffs do not have a right to assistance under the ADA, it is not unlawful for the state to criminalize such assistance. The physician plaintiffs have therefore failed to state a claim under the ADA.

Finally, because the plaintiffs have not stated a claim under the ADA, they have not

stated a claim under the Rehabilitation Act. *See Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002) (recognizing that "there is no significant difference in the analysis of rights and obligations created by the two Acts").

* * *

The defendants' motions to dismiss are granted. As explained above, dismissal is with leave to amend, notwithstanding the Court's skepticism that amendment would be fruitful. Any amended complaint must be filed within 21 days of this order. If none is filed by that time (or if the plaintiffs indicate they do not intend to file an amended complaint), the dismissal will be with prejudice.

**IT IS SO ORDERED.**

Dated: June 22, 2022

VINCE CHHABRIA
United States District Judge